UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
JILL ANN LIEBER PASARELL,            : 12 Civ. 6232 (JPO) (JCF)
                                     :
              Plaintiff,             :        REPORT AND
                                     :        RECOMMENDATION
        - against -                  :
                                     :
CAROLYN W. COLVIN,                   :
Acting Commissioner                  :
of Social Security,                  :
                                     :
              Defendant.             :
- - - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE J. PAUL OETKEN, U.S.D.J.:

        The plaintiff, Jill Ann Lieber Pasarell, brings this action

pursuant to section 405(g) of the Social Security Act (the "Act"),

42 U.S.C. § 405(g), seeking review of a determination of the

Commissioner of the Social Security Administration (the

"Commissioner").  That determination affirmed a decision by an

Administrative Law Judge ("ALJ") which found that the plaintiff was

not disabled as of December 14, 2010, and was not entitled to

disability insurance benefits or Supplemental Security Income

("SSI").  Each party has submitted a motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.

        Ms. Pasarell seeks disability insurance benefits and SSI on

the grounds that she suffers from panic disorder without

agoraphobia,[1] depression not otherwise specified (NOS),[2] bipolar disorder, post traumatic stress disorder, and borderline personality disorder,[3] in addition to obesity and back pain. (R. at 35-36, 175, 415).[4] For the reasons that follow, I recommend that the Commissioner's motion be granted and the plaintiff's motion be denied.

Background

A. Personal Background

Ms. Pasarell was born on October 4, 1975, and currently holds a bachelor's degree from Kaplan University, an online educational institution. (R. at 31-32, 110). The plaintiff was most recently employed in customer relations at a newspaper for two years. (R. at 31, 138). In this position, she was responsible for managing client accounts over the telephone, ensuring that payments were

---

[1] Panic disorder without agoraphobia is manifested by panic attacks and concern about the attacks or a change in behavior because of the attacks. Diagnostic and Statistical Manual of Mental Disorders -- Text Revision ("DSM-IV-TR"), 440 (4th Ed. Rev. 2000).

[2] Depression not otherwise specified is a category of disorders that do not meet the criteria for major depressive disorder, dysthymic disorder, adjustment disorder with depressed mood, or adjustment disorder with mixed anxiety and depressed mood. DSM-IV-TR, at 381.

[3] Borderline personality disorder is a pattern of instability in personal relationships and self-image. DSM-IV-TR at 658.

[4] "R." refers to the administrative record filed with the Commissioner's Answer.

made, and responding to customer questions.  (R. at 27-28).  She was terminated on August 4, 2008, for attendance issues that she alleges were the result of panic attacks.  (R. at 27).  Previously, the plaintiff had worked as a night manager at a warehouse, handling invoices.  (R. at 37).

Ms. Pasarell lives alone, supporting herself with temporary government assistance and help from her mother.  (R. at 28).  She is currently working toward her master's degree (R. at 31-32) and aspires to earn a Ph.D.  (R. at 245).  She spends her days talking with friends, though in the past few years several friends have ended their friendship because, Ms. Pasarell believes, of her mental impairments.  (R. at 33-34).  Currently, she is physically able to drive, but her license is suspended due to unpaid tickets.  (R. at 33).

Ms. Pasarell suffers from both physical and psychiatric impairments.  She has been diagnosed with panic disorder without agoraphobia, bipolar I,[5] borderline personality disorder, and depression .  (R. at 248, 323).  Additionally, she has sought medical care for back pain, headaches, a bladder infection, and bronchitis.  (R. at 159, 208, 291, 408).  Her psychological impairments formed the basis for her original claim for SSI and

---

[5] Bipolar I disorder is characterized by one or more manic or mixed episodes of elevated moods.  DSM-IV-TR at 382.

disability insurance benefits.  (R. at 137).

    B. <u>History of Physical and Mental Impairments</u>

    Ms. Pasarell submitted four reports issued by medical providers during the time period for which she is claiming disability insurance and SSI.  Additionally, the record contains medical documentation from the four years prior.  (R. at 242-43).

    1. <u>Orange County Regional Medical Center</u>

    On October 19, 2008, Ms. Pasarell visited the Orange County Regional Medical Center Emergency Room complaining of painful urination and back pain.  (R. at 201-02).  The report from this visit states that she displayed no mental status impairments but did not provide further psychiatric information.  (R. at 196).  The emergency room provided the plaintiff with pain medication and discharged her.  (R. at 198).

    On December 8, 2008, Ms. Pasarell returned to refill a prescription.  (R. at 217, 224).  The report at that time noted that her memory was "intact" and she had an "organized" thought process.  (R. at 222).  She was diagnosed with anxiety disorder and fibromyalgia.[6]  (R. at 223).  Additionally, using the Global Assessment of Functioning ("GAF") scale, Ms. Pasarell was deemed to

---

[6] The diagnoses along Axis II and Axis IV are illegible, but the plaintiff does not rely on these diagnoses in any of her applications.

have a GAF score of 65.[7]  (R. at 223).  She was provided with prescriptions for Naproxen[8] and Hydroxyzine,[9] referred to Occupations, Inc. for further psychiatric care,[10] and discharged. (R. at 223, 236-37).

    2. <u>Dr. Helprin</u>

On January 20, 2009, Ms. Pasarell saw a consulting examiner for the Social Security Administration, Dr. Leslie Helprin, for a psychiatric evaluation. (R. at 245-49).  Dr. Helprin diagnosed the plaintiff with panic disorder without agoraphobia, bipolar I disorder, polysubstance abuse in full sustained remission, fibromyalgia, hypoglycemia, asthma, and headaches. (R. at 248-49).

---

[7] The GAF scale rates overall psychological functioning on a scale of 100-0. <u>DSM-IV-TR</u> at 34.  Scores 100-81 indicate minimal or no symptoms; the 80-71 range is for patients responding appropriately to stress, and patients within the 70-61 bracket have mild symptoms or some difficulty in social, occupational, or school settings but generally function well. <u>DSM-IV-TR</u> at 34.

[8] Naproxen is a pain reliever used for arthritis and shoulder pain. <u>Naproxen: MedlinePlus Drug Information</u>, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited June 24, 2013).

[9] Hydroxyzine treats anxiety, itching from allergies, alcohol withdrawal, and nausea. <u>Hydroxyzine: MedlinePlus Drug Information</u>, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html (last visited June 24, 2013).

[10] Occupations, Inc. is an organization that provides services such as mental health care, affordable housing, and rehabilitation. <u>Mission</u>, Occupations, Inc. (June 24, 2013) http://www.occupations.org/occupations/about-us/mission/.

This diagnosis did not include a GAF rating.  Ms. Pasarell told Dr.
Helprin that she performs daily grooming tasks and household chores
on her own.  (R. at 248).  Dr. Helprin opined that the plaintiff
could perform simple and complex tasks independently, make
appropriate decisions, and deal appropriately with stress.  (R. at
248).  He recommended that, after completing her online education,
if she is found unable to work, she should work with a job support
coach to train for a new job.  (R. at 249).  He recommended that
she continue her current psychiatric and psychological treatment
plans and have further evaluations to determine if she could return
to the workforce.  (R. at 249).

    3. Dr. Apacible

    On February 5, 2009, Dr. M. Apacible reviewed Dr. Helprin's
report for a residual functional capacity evaluation.  (R. at 279-
81).  Dr. Apacible found that, while Ms. Pasarell had bipolar I
disorder and panic disorder without agoraphobia, she did not meet
the criteria to qualify as disabled under guidelines.  (R. at 268,
270).  He concluded that her allegations concerning her limitations
were credible, but "not to the extent alleged," and he opined that
she maintained the ability to perform work activity.  (R. at 281).
He also found that Ms. Pasarell had suffered from polysubstance
abuse, but was in remission.  (R. at 273).

    After evaluating the psychiatric impairments, Dr. Apacible

concluded that Ms. Parasell was "not significantly limited" in her ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (R. at 279). Additionally, he found that she was "not significantly limited" in "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. at 280). In his functional capacity assessment Dr. Apacible discussed Dr. Helprin's examination and opined that "[b]ased on the medical evidence in the file, the claimant retains the ability to perform work activity." (R. at 281).

### 4. Orange County Department of Social Services

On October 18, 2010, Ms. Pasarell received a psychiatric assessment from the Orange County Department of Social Services. (R. at 415-16). She was diagnosed with depression (NOS), panic disorder without agoraphobia, social anxiety, borderline personality disorder, and back issues. (R. at 415). She was found to have a GAF score of 60.[11]  (R. at 415-16). The report stated that Ms. Pasarell experienced an "escalation of [her] symptoms" but

---

[11] A GAF score between 51-60 refers to moderate symptoms or moderate difficulty in social or occupational situations. DSM-IV-TR at 34.

did not specify if those were increases in depression, panic disorder, anxiety, or borderline personality disorder. (R. at 416). This report indicated Ms. Pasarell was not able to work at all because of her anxiety in stressful situations. (R. at 416). It also stated that she functioned normally in understanding complex instructions and handling low stress, simple tasks. (R. at 416).

### 5. Additional Medical Reports

In addition to the primary medical reports discussed above, the record contains several other reports. Between December 15, 2008, and April 28, 2010, Ms. Pasarell visited Occupations, Inc. eleven times, primarily to refill her prescriptions for Vistaril[12] and Celexa.[13] (R. at 326-80). The report for her December 15, 2008, visit noted a GAF score of 60, and the plaintiff was diagnosed with panic disorder without agoraphobia, depressive disorder (NOS), and borderline personality disorder. (R. at 323). This diagnosis was confirmed in subsequent reports. (R. at 329,

---

[12] Vistaril is a brand name of Hydroxyzine. Hyrdroxyzine: MedlinePlus Drug Information, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html (last visited June 25, 2013).

[13] Celexa is a brand name for Citalopram which is used to treat depression. Citalopram: MedlinePlus Drug Information, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited June 25, 2013).

334, 339, 344, 349, 354, 359, 364, 374).

On October 06, 2010, and several other occasions Ms. Pasarell visited Walden Medical for, among other things, a sore throat and back pain.[14] (R. at 386-91). Some of these reports noted that the plaintiff experienced an iron deficiency, anxiety, and depression. (R. at 386-91).

Ms. Pasarell also visited St. Luke's Cornwall Hospital on three occasions. (R. at 289-322). During the first visit, on January 11, 2008, Ms. Pasarell requested a refill of Vistaril and Celexa and stated she had bronchitis. (R. at 291-92). On April 16, 2008, she again asked for a refill of Vistaril and Celexa. (R. at 298-99). On February 7, 2009, she went to the hospital complaining of chest pains. (R. at 310). After a radiographic examination, Dr. John Markitsz found no evidence of pulmonary infiltrations, and Ms. Pasarell was discharged the next day. (R. at 317-18).

Ms. Pasarell provided medical records from visits to the Riverdale Mental Health Association in 2004. (R. at 241). There, she was diagnosed with a GAF score of 55, and the records noted that she stopped attending treatment. (R. at 243).

The final record provided is an admission form from the

---

[14] Parts of the reports are illegible, and the dates at the top of the forms are cut off.

Sullivan County Jail dated January 22, 2004.  (R. at 252).  These records noted that Ms. Pasarell had a history of panic attacks, depression, occasional back pain, and headaches.  (R. at 253-54).  Additionally, the record indicated that she took Celexa and Neurontin.[15]  (R. at 259, 262).

C. <u>Procedural History</u>

On November 24, 2008, Ms. Pasarell filed an application for disability insurance benefits and SSI benefits, alleging that she had been disabled since August 4, 2008.  (R. at 110).  The application was denied on February 6, 2009 (R. at 50), and on March 26, 2009 (R. at 66), the plaintiff requested a hearing before an ALJ.  The hearing was held before the Honorable Dennis G. Katz on November 3, 2010.  (R. at 22).  On December 14, 2010, the ALJ issued a decision finding that Ms. Pasarell was not disabled and was able to return to her previous work in customer relations.  (R. at 21).  That decision became the final determination of the Commissioner when the Appeals Council denied Ms. Pasarell's request for review on July 9, 2012.  (R. at 1).  This action followed.

---

[15] Neurontin is a brand name for Gabapentin, a drug used to treat seizures and pain. <u>Gabapentin: MedlinePlus Drug Information</u>, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited June 25, 2013).

Discussion

    A. <u>Standard of Review</u>

       A federal court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." <u>Hahn v. Astrue</u>, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009) (internal quotation marks omitted); <u>see also</u> <u>Longbardi v. Astrue</u>, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009); <u>Bonet v. Astrue</u>, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008). Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Calvello v. Barnhart</u>, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. <u>Tejada</u>, 167 F.3d at 773; <u>Calvello</u>, 2008 WL 4452359, at *8.

       Substantial evidence in this context is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hahn</u>, 2009 WL 1490775, at *6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)); <u>accord</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004). "In determining whether substantial evidence exists, a

11

reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21; see also Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).

Even if the record, as it stands, contains substantial evidence of disability, the Commissioner's decision may not withstand a challenge if the ALJ committed legal error. Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009). Of particular importance, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ has an affirmative obligation to fully develop the administrative record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  The ALJ bears this duty even when the claimant is represented by counsel. Id.  Toward this end, the ALJ must make every reasonable effort to help an applicant get medical reports from his medical sources. 20 C.F.R. § 404.1512(d). More

specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the [plaintiff's] residual functional capacity." Casino-Ortiz v. Astrue, No. 06 Civ. 155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007). Therefore, the ALJ must seek additional evidence or clarification when the "report from [the plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1).[16]  In short, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information to fill any clear gaps from the physician before dismissing the doctor's opinion.  See, e.g., Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information . . . sua sponte.").

In addition, the ALJ must adequately explain his analysis and

_____

[16] This regulation was in effect when this claim was adjudicated. Effective March 26, 2012, C.F.R. § 404.1512 was amended to, among other things, remove sub-paragraph (e). 77 Fed. Reg. 10651; see Martello v. Astrue, No. 12-CV-215S, 2013 WL 1337311, at *3 n.3 (W.D.N.Y. March 29, 2013).

reasoning in making the findings on which his ultimate decision rests, and must address all pertinent evidence. See, e.g., Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984).  "It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions." Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991).  Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996).

    B. Determination of a Disability

    A claimant is disabled under the Act and therefore entitled to disability benefits if he can demonstrate that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Hahn, 2009 WL 1490775, at *6; Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42

14

U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Next, the claimant must prove that he has a severe impairment that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); see 20 C.F.R. § 404.1520(a)(4)(ii). Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P, App. 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If, however, the claimant's impairment is neither listed nor equal to any listed impairment, he must prove that he does not have the residual functional capacity ( "RFC") to perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv), (e); Longbardi, 2009 WL 50140, at *23 (quoting Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996). The residual functional capacity "is the most [a claimant] can still do despite [his] limitations" in terms of work-related physical and mental activities. 20 C.F.R. § 404.1545(a)(1). When determining a claimant's residual functional capacity, the ALJ must consider the totality of the record, giving due weight to every medical opinion, regardless of its source. 20

15

C.F.R. § 404.1527.   The Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.   Hahn, 2009 WL 1490775, at *7; see also Brown, 174 F.3d at 62.   At each stage of his evaluation, the ALJ must explain his analysis and address all pertinent evidence.   Ferraris, 728 F.2d at 587 ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

Finally, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi, 2009 WL 50140, at *23 (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).   In assessing whether there is alternative substantial gainful employment, the ALJ must consider the plaintiff's residual functional capacity to perform work other than his past job. 20 C.F.R. § 404.1520(g)(1).

C. The ALJ's Determination

The ALJ's determination of Ms. Pasarell's disability claim followed the five-step analysis.   At step one, he found that Ms.

Pasarell had not engaged in substantial, gainful employment since August 4, 2008. (R. at 17). At step two, he concluded that Ms. Pasarell had severe impairments consisting of panic disorder, depression, and personality disorder and was also obese and had a back impairment. (R. at 17). At step three, the ALJ found that she did not have a disability that would automatically qualify her for SSI and disability insurance. 20 C.F.R. § 404, Subpt. P., App. 1; (R. at 17-18). The parties do not dispute the ALJ's findings at these first three steps.

In the step four anaylsis, the ALJ found Ms. Pasarell had a residual functional capacity to perform "a full range of work at the medium exertion levels," limited to tasks "which are not overly complex and . . . with which [Ms. Pasarell] is familiar." (R. at 18). In light of these findings, the ALJ concluded that she could perform her relevant past work. (R. at 21). Because of this, the ALJ did not go on to consider step five.

Ms. Pasarell challenges the ALJ's decision the grounds that (1) the ALJ did not accord sufficient weight to the evidence provided by Ms. Pasarell's treating physician, (2) his determination of her residual functional capacity was not supported by sufficient evidence, (3) he erred in his assessment of her credibility, and (4) there was not sufficient evidence to support his decision that she could return to her previous work.

17

D. <u>Treating Physician Rule</u>

A treating physician's evaluation is to be given more weight than other medical reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider other factors in determining the weight to be given to that opinion. 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must consider (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); <u>see</u> <u>Halloran</u>, 362 F.3d at 32. The ALJ must give "good reasons" for determining the weight given to the treating physician's opinion, 20 C.F.R. § 404.1527(c)(2), and failure to do so may result in remand of the case, <u>see</u> <u>Halloran</u>, 362 F.3d at 33; <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999).

Determination of dispositive issues, such as whether a

claimant "meet[s] the statutory definition of disability" and cannot work, are reserved for the Commissioner.   20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see Snell, 177 F.3d at 133.   Thus, the Social Security Administration considers the data and opinion of the treating physicians but draws its own conclusions as to whether the claimant is disabled.   A treating physician's statement that the plaintiff was unemployable cannot itself be determinative. See Snell, 177 F.3d at 133.

Ms. Pasarell takes issue with the greater weight given to the reports of Dr. Helprin and Dr. Apacible compared to what the ALJ accorded to the report of the Orange County Department of Social Services.   (Plaintiff's Memorandum of Law in Support of a Motion for Judgment on the Administrative Record and the Pleadings Pursuant to Rule 12(c) F.R.C.P. ("Pl. Memo.") at 18).   Considering that Ms. Pasarell was treated at the Orange County Department of Social Services only once, the ALJ did not need to give controlling weight to this report. 20 C.F.R. § 404.1527(c)(2).   Furthermore, it was within the ALJ's discretion to accord only slight weight to the report because it consisted of a check-off form without explanations for its diagnoses or conclusions.   Id.   Dr. Helprin's narrative report provided significantly more information (R. at 245-49), while Dr. Apacible's report, though also in a check-off format, outlined in detail the plaintiff's impairments and assessed

19

her residual functional capacity (R. at 279-81).

Ms. Pasarell also argues that the ALJ failed to give weight to the additional medical reports. (Pl. Memo at 20). However, the ALF explicitly discussed four of those reports. (R. at 19). He observed that the October 19, 2008, report found that Ms. Pasarell had no mental impairments. (R. at 19). The ALJ also referenced December 8, 2008 report, which referred the plaintiff for further treatment at Occupations, Inc. (R. at 19). Although the ALJ mentioned the report from Riverdale Mental Health Association discussing treatment of Ms. Pasarell during 2004 (R. at 19), he need not have given it significant weight since the plaintiff was substantially gainfully employed after her treatment at Riverdale. Finally, the ALJ considered the December 19, 2008, psycho-social assessment from Occupations, Inc. (R. at 19) that diagnosed Ms. Pasarell with panic disorder without agoraphobia and borderline personality disorder. (R. at 323). This was the most comprehensive report from that agency.

The ALJ, then, properly weighed the various medical reports in light of such factors as the duration of the physician-patient relationship and the depth of analysis provided. (R. at 19-20).

E. Residual Functional Capacity

At the fourth step of the disability determination, the ALJ established the plaintiff's residual functional capacity. After

20

determining that the plaintiff had a medically cognizable impairment, he evaluated the plaintiff's capacity to work in light of her impairments by considering the medical reports and her testimony. (R. at 19-21); see Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an individual's Statements, SSR 96-7P, 1996 WL 374186 (July 2, 1996); 20 C.F.R. § 404.1529. Ms. Pasarell argues the ALJ wrongly determined that her statements regarding her limitations were not credible. (Pl. Memo. at 6-11). She also contends that he erred in his evaluation of the evidence used in assessing her residual functional capacity. (Pl. Memo. at 11-13).

1. Credibility Assessment

In assessing Ms. Pasarell's credibility, the ALJ examined Ms. Pasarell's testimony and compared it to the medical reports regarding her functional limits. (R. at 19-21). Both Dr. Helprin and Dr. Apacible found no limitation in her daily living. (R. at 20). Orange County Department of Social Services noted moderate limitations with concentration, the use of public transportation, and interactions with others, but no limitations for socially appropriate behavior, low stress tasks, or understanding complex instructions. (R. at 416). The ALJ pointed to Ms. Pasarell's admission to Dr. Helprin about her ability to perform daily tasks like shopping, using public transportation, and socializing with

friends as contradictory to her testimony that she rarely leaves the house. (R. at 19-20).

Comparing Ms. Pasarell's claims about her inability to work because of stress with the fact that she was working towards academic degrees while unemployed, the ALJ found her capable of concentrating and handling stress. (R. at 19-20).

Additionally, the ALJ compared Ms. Pasarell's statement that she lost friends with her statement that she kept herself occupied while unemployed by socializing with. (R. at 19-20).

The plaintiff relies on Jones v. Astrue, No. 09 Civ. 5577, 2011 WL 3423771 (S.D.N.Y. July 15, 2011), where the court ordered a remand because the ALJ failed to identify medical support for the ALJ's residual functional capacity determination. Here, by contrast, the ALJ discussed both the medical evidence and Ms. Pasarell's testimony at the hearing in evaluating her social habits, ability to concentrate, capacity to follow directions, and capability to deal with stress. (R. at 20).

The ALJ properly relied upon the information from the medical reports describing Ms. Pasarell's limitations, her academic pursuits, and her social habits to determine that her claims of being unable to work were not credible. (R. at 20).

2. Residual Functional Capacity

Ms. Pasarell argues that, in determining her functional

22

restrictions, the ALJ did not provide sufficient evidentiary support. (Pl. Memo. at 11). She contends that he failed to relate his statements regarding her functional capacity to her symptoms.

In coming to his conclusion, the ALJ provided a function-by-function assessment of Ms. Pasarell's abilities that aligned with the requirements of her previous position: sitting, standing, walking, and lifting. (R. at 21). The ALJ was not required to discuss every physical function that may have shed light on the plaintiff's abilities and limitations. <u>Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u> SSR 96-8P, 1996 WL 374184, at *2-3 (July 2, 1996). As required, the ALJ considered each function separately, as when he stated that the Ms. Pasarell "is capable of sitting, standing and walking for 8 hours (for each activity) . . . [and] is capable of lifting/carrying objects weighing up to 50 pounds." (R. at 21); SSR 96-8P, 1996 WL 374184, at *2-3 (July 2, 1996). The ALJ thus relied on sufficient evidentiary support in coming to his conclusion that Ms. Pasarell had a residual functional capacity that permitted her to perform a full range of work at medium exertion level, taking into consideration her nonexertional limitations.

F. <u>Ability to Engage in Prior Work</u>

At step four, The ALJ determined that Ms. Pasarell could

23

perform relevant past work.  (R. at 21).  The plaintiff argues the ALJ did not develop the record regarding her previous job as a customer relations employee. (Pl. Memo. at 14).  Additionally, she contends that the ALJ should have elicited a testimony from a vocational expert to determine if she could perform any substantial gainful.  (Pl. Memo. at 15-16).

To determine whether Ms. Pasarell could perform her past work, the ALJ inquired during the hearing into Ms. Pasarell's previous work in customer relations.  (R. at 27-28).  She explained that her job entailed "mak[ing] sure that [customers'] payments were done, [she] called them if there were any problems . . . .  They called [her] if there were any problems."  (R. at 27).  She stated that she worked in an office with other employees.  (R. at 28).  On her Disability Report, Ms. Pasarell wrote that this position involved "answer[ing] phones, clerical duties, [and] data entry."  (R. at 138).  Additionally, it required sitting, writing, and grasping large objects for seven and one-half hours with no time allocated to the other tasks such as walking, sitting, carrying, stooping, climbing, kneeling, crouching, crawling, reaching, or lifting.  (R. at 138-39).

The information that Ms. Pasarell provided creates a record sufficient for the ALJ to make his determination without calling a vocational expert.  "'[A] vocational expert is not required where

. . . the ALJ has already gathered "substantial evidence" to support his determination of the claimant's residual functional capacity.'" Garrett v. Astrue, 09 Civ. 6478, 2011 WL 856282 at *5 (S.D.N.Y. March 11, 2011) (quoting Stanton v. Astrue, 370 Fed. App'x 231, 235 (2d Cir. 2010)).   Moreover, the vocational guidelines or vocational experts are used at step five, after the ALJ decided that the plaintiff cannot return to her previous relevant work.   20 C.F.R. Pt. 404, Subpt. P, App. 2 §200.00(a). Because the ALJ determined that Ms. Pasarell could return to her previous employment, he did not have the burden of evaluating step five and therefore did not need to elicit testimony from a vocational expert. Hawkins v. Barnhart, 356 F. Supp. 2d 359, 367 (S.D.N.Y 2005).

<u>Conclusion</u>

For the foregoing reasons, I recommend that the Commissioner's decision be upheld, the plaintiff's motion (Docket no. 9) be denied,  and the government's motion (Docket no. 16) be granted. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.   Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable J. Paul Oetken, 40 Foley Square, Room

2101, New York, New York, 10007 and to the chambers of the

undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections will preclude appellate review.


                    Respectfully Submitted,



                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       June 26, 2013

Copies mailed this date to:

Gary James Gogerty, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
555 Hudson Valley Ave.
Suite 100
New Windsor, NY 12553

Leslie A. Ramirez-Fisher, Esq.
Kirti Vaidya Reddy, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, NY 10007